## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CARMODY & TORRANCE, | : | |
|     Plaintiff, | : | |
| | : | |
|   v. | : | |
| | : | CIVIL ACTION NO. |
| DEFENSE CONTRACT MANAGEMENT | : | 3:11-CV-1738 (JCH) |
| AGENCY and UNITED STATES | : | |
| DEPARTMENT OF DEFENSE, | : | |
|     Defendants. | : | |
| | : | MARCH 13, 2014 |
|     and | : | |
| | : | |
| SIKORSKY AIRCRAFT CORPORATION, | : | |
|     Intervenor | : | |

**RULING RE: PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. No. 23), DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. No. 50), AND INTERVENOR'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 79)**

## I.   INTRODUCTION

Plaintiff Carmody & Torrance LLP ("Carmody") brings this action against defendants Defense Contract Management Agency ("DCMA") and the United States Department of Defense ("DOD") (collectively, the "DOD defendants"), alleging violations of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, in connection with Carmody's May 2010 request to DCMA (the "FOIA Request").  On October 1, 2013, Sikorsky Aircraft Corporation ("Sikorksy") moved to intervene as a defendant, which Motion (Doc. No. 34) the court granted.  See Doc. No. 73.

Carmody moves for summary judgment on the inadequacy of DCMA's search and disclosures in response to the FOIA Request.  The DOD Defendants and Sikorsky cross-move for summary judgment on these issues.  For the reasons set forth below, Carmody's Motion (Doc. No. 23) as well as the DOD defendants' and Sikorsky's Cross-Motions (Doc. Nos. 50 & 79) are each **granted in part and denied in part**.

1

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Carmody is a law firm organized under Connecticut's limited liability partnership laws; it does business in Connecticut and has its principal office in Waterbury.  See Pl.'s Local Rule 56(a)(1) Statement ("Pl.'s L.R. 56(a)(1)") (Doc. No. 25) ¶ 1.  As relates to the instant action, Carmody represents DiNardo Seaside Tower, Ltd. ("DiNardo"), which owned an industrial property in Bridgeport (the "Bridgeport II Facility") formerly leased by Sikorsky.  See Pl.'s Mem. in Supp. of Pl.'s Mot. for Partial Summ. J. ("Pl.'s Mem.") (Doc. No. 24) at 8; Pl.'s Ex. A to Pl.'s Mem. (Doc. No. 24-1), Piantek Decl. ¶¶ 2, 4-7. DiNardo brought an action in state court against Sikorsky (the "State Court Action"), alleging, inter alia, breach of a commercial lease agreement.  See Pl.'s Ex. A to Piantek Decl. (Doc. No. 24-2), DiNardo Seaside Tower. Ltd. v. Sikorsky Aircraft Corp., No. UWY-CV-09-6002398-S, Compl. ¶¶ 1-22.

DCMA is a U.S. government agency within DOD that oversees and manages defense contracts entered into by DOD.  See Pl.'s L.R. 56(a)(2) ¶ 2.  DCMA does not solicit or award contracts except as directed by the procuring agency.  See Defs.' Local Rule 56(a)(1) Statement ("Defs.' L.R. 56(a)(1)") (Doc. No. 60) ¶ 2.  After consulting with the procuring agency, DCMA may terminate a contract for default or for the convenience of the government.  Id. ¶ 3.  The procuring agency, however, retains authority to terminate its contracts unilaterally and to conduct termination settlement negotiations itself, without the involvement of DCMA.  Id.

### A.   Comanche Helicopter Contract

In June 2000, the U.S. Army awarded a contract jointly to Boeing and Sikorsky for the production of Comanche helicopters (the "Contract" or "Comanche Project").  Id. ¶ 4.  In light of anticipated work on the Comanche Project, in March 2002, Sikorsky and

DiNardo agreed to reinstate a lease for the Bridgeport II Facility that Sikorsky had previously terminated.  See Piantek Decl. ¶ 7.  Under the terms of the reinstated lease (the "Amended Lease"), Sikorsky agreed to convert part of the Bridgeport II Facility from manufacturing space into office space to accommodate engineers and technicians needed for the Comanche Project.  Id.  The Amended Lease required these improvements to remain part of the Bridgeport II Facility.  See Ex. C to Piantek Decl. (Doc. No. 24-4) ¶ 6.

DCMA administered the Contract.  See Defs.' L.R. 56(a)(1) ¶ 8.  Sikorsky's costs for the Comanche Project were submitted to DCMA, which, together with the Defense Contract Audit Agency ("DCAA"), would perform evaluations and audits.  Id. ¶ 11.

In February 2004, the U.S. Army terminated the Contract.  See Defs.' L.R. 56(a)(1) ¶ 4.  DCMA was not involved in the termination settlement negotiations.  Id. ¶ 5.  As part of the settlement, the Contract was modified to cover payment of $7,301,543 in costs associated with the Bridgeport II Facility.  See Intervenor's Local Rule 56(a)(1) Statement ("Intervenor's L.R. 56(a)(1)") (Doc. No. 79-3) ¶ 2; Pl.'s Ex. D to Pl.'s Mem. (Doc. No. 24-9) at 4.[1]

B.   May 2010 FOIA Request

The FOIA Request at issue here was made by letter dated May 20, 2010 to DCMA from Kurtis Piantek, an attorney at Carmody.  See Pl.'s L.R. 56(a)(1) ¶ 4.  In that letter, Attorney Piantek requested that DCMA disclose:

> All documents related to, or concerning any payments, credits or other benefit related to structured cost settlements received by Sikorsky Aircraft

---

[1] Carmody first received summary information regarding the amount paid to Sikorsky for costs associated with the Bridgeport II Facility in April 2010, in response to a prior FOIA request to the U.S. Army.  See Pl.'s Mem. at 9; Defs.' Ex. C (Doc. No. 55), Howell Decl. ¶¶ 5, 10.

Corporation in connection with the set-up and shut down of its facility located at 1010-1080 Atlantic Street, Bridgeport, CT 06606 which was utilized as the Joint Program Office for part of the Comanche Helicopter Program. Please note that this request does NOT seek proprietary or technical information regarding the programs or manufacturing undertaken at this facility. Rather, this request solely seeks documents regarding any claim submitted or any compensation paid to Sikorsky Aircraft Corporation concerning the cancelation of the Comanche Program and its financial impact on overhead at the above referenced facility in Bridgeport. If possible, please identify and/or break down costs with specific details within all categories allowed and disallowed by the United States Government.

Id. ¶ 5; Pl.'s Ex. A to Pl.'s L.R. 56(a)(1) ("FOIA Request") (Doc. No. 25-1) at 2.  In addition, Attorney Piantek requested that DCMA disclose all information concerning the calculation of the total termination cost.  See FOIA Request at 2.

C.     DCMA's Disclosures

The FOIA Request was received by DCMA on or about May 28, 2010.  See Defs.' Ex. A (Doc. No. 61), Williamson Decl. ¶ 12.  DCMA emailed Attorney Piantek on July 22, 2010, notifying him that all Contract records would need to be ordered for a fee from a National Archives Center to which they had been sent.  Id. ¶ 13.  He agreed to pay the fee and requested the opportunity to review the records prior to having copies made.  Id. ¶ 14.

On December 1, 2010, DCMA informed Attorney Piantek that the records had arrived at DCMA and were in the process of being reviewed by Carlo Tursi, who was the lead DMCA Administrative Contracting Officer ("ACO") responsible for the Contract and the ACO assigned to Boeing in Philadelphia.  Id. ¶ 16.  Elio Meneo, the ACO assigned to Sikorsky in Connecticut, retired from DCMA in December 2010, prior to receipt of the FOIA Request.  Id. ¶ 23.  Upon Mr. Meneo's retirement, his email account was deleted, and his hard drive was erased.  Id.

4

On January 6, 2011, DCMA informed Attorney Piantek that Mr. Tursi had found 60 payment vouchers and that DCAA might also have responsive records.  Id. ¶ 17. Subsequently, on February 7, 2011, Attorney Piantek declined to pay for production of the payment vouchers and requested referral of the FOIA Request to DCAA.  Id. ¶ 18. On February 18, 2011, DCAA referred the FOIA request back to DCMA with 23 potentially responsive audits totaling 241 pages, and on May 4, 2011, DCMA notified Attorney Piantek of these audits.  Id. ¶¶ 19-20.

In addition, DCMA searched its electronic databases by keyword and contract number.  See Williamson Decl. ¶ 24.  These searches, however, yielded only the Contract itself and two non-responsive records of Contract modifications.  Id.  The DCMA Terminations Center, which handles terminations conducted by DCMA, also searched for but was unable to locate responsive records, presumably because it was not involved in the termination of the Contract.  Id. ¶ 36.

After further exchanges between DCMA and Attorney Piantek, on November 18, 2011, DCMA counsel Jerome Brennan was served with a subpoena duces tecum requiring a DCMA employee with knowledge of the payments made to Sikorsky in connection with the Bridgeport II Facility to appear in the State Court Action.   Id. ¶ 32. That subpoena was forwarded to Bruce Metzger, the U.S. Army employee responsible for terminating the Contract.  Id. ¶ 32.  In response, Mr. Metzger provided DCMA a copy of a draft Price Negotiation Objectives Memorandum (the "Price Memorandum"), which DCMA sent to Sikorsky for review, along with other files received from various DCMA regional offices.  Id. ¶ 36.

On April 20, 2012, following DCMA's own review of the documents and Sikorsky's requested redactions, DCMA released to Carmody 75 pages of heavily redacted documents, including the Price Memorandum.  Id. ¶¶ 36-37; see Pl.'s Ex. C to Pl.'s Mem. ("Pl.'s Ex. C") (Doc. No. 24-8).  Altogether, DCMA's disclosures to date include, inter alia:

(1)     DCAA Audit No. 2641-2005C17100002 dated April 13, 2006;

(2)     Price Memorandum, see Pl.'s Ex. C at 5-10;

(3)     Substitute Form 1437 (the "SF 1437") and Addendum with settlement costs, id. at 11-12;

(4)     Termination Settlement Proposal, id. at 13-15;

(5)     incurred costs summaries, id. at 16-20;

(6)     a meeting attendance list, id. at 22;

(7)     Bridgeport II Facility-related summaries and UT Realty Memorandum, id. at 21, 23-27;

(8)     a 21-page Contract Modification document as well as a stray page from a similar document, id. at 28-48, 79;

(9)     two invoices and an email, id. at 49-51;

(10)    a letter from Boeing Sikorsky, id. at 52-69, with an attachment containing Recent Treasury Bill Auction Results, id. at 70; and

(11)    an 8-page Bridgeport II Connecticut Facility Move-Out Budgetary Cost Matrix, id. at 71-78

DCMA provided a <u>Vaughn</u> index explaining its redactions to the above materials.[2]  <u>See</u> Defs.' Ex. D (Doc. No. 54) (the "Vaughn Index").  At oral argument, counsel for DCMA represented that there has been no further disclosures to Carmody subsequent to the April 2012 disclosure.

  D. <u>Sikorsky's Representations</u>

  As attested by Sikorsky's Vice President for Financial Planning and Analysis, Graham Main, Sikorsky provided DCMA with the information sought here regarding the Bridgeport II Facility as part of the Price Memorandum, which was drafted to facilitate termination settlement negotiations with the government over the Contract, and as part of DCAA's audit.  <u>See</u> Main Aff. (Doc. No. 79-2) ¶ 6.  The information was marked as proprietary when disclosed by Sikorsky, and Sikorsky does not otherwise release such information to the public.  <u>Id.</u> ¶ 7.  Indeed, Sikorsky has a Non-Disclosure Agreement policy regarding distribution of this type of proprietary information to third parties.  <u>Id.</u>

## III. LEGAL STANDARDS

  A. <u>Summary Judgment</u>

  A motion for summary judgment is properly granted only if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." <u>O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA</u>, 642 F.3d 110, 116 (2d Cir. 2011). Thus, the role of the district court in deciding a summary judgment motion "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact."  <u>Id.</u>  In making this determination, the court must resolve all ambiguities and draw

---

[2] Since <u>Vaughn v. Rosen</u>, 484 F.2d 82 (D.C. Cir. 1973), such indexes itemizing the non-disclosed records, or portions of a record, and the applicable exemption have become a staple of the government agency's submissions in FOIA cases.  <u>See</u> <u>Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enforcement Agency</u>, 811 F. Supp. 2d 713, 733 (S.D.N.Y. 2011) ("In addition to affidavits, agencies generally submit <u>Vaughn</u> indexes to sustain their burden.").

all inferences in favor of the party against whom summary judgment is sought.  See
Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir. 2013).  Where, as here, the
parties cross-move for summary judgment, "each party's motion must be examined on
its own merits, and in each case all reasonable inferences must be drawn against the
party whose motion is under consideration."  Morales v. Quintel Entm't, Inc., 249 F.3d
115, 121 (2d Cir. 2001).

The moving party bears the burden of establishing the absence of genuine
issues of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d
Cir. 2010).  Once that initial burden is met, to defeat the motion, the party opposing
summary judgment must set forth "specific facts" that demonstrate the existence of "a
genuine issue for trial."  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed.
R. Civ. P. 56(e)).  For summary judgment purposes, a genuine issue exists where the
evidence is such that a reasonable jury could decide in the non-moving party's favor.
See Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685, 693 (2d Cir.
2012); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d
Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (stating
that the non-moving party must point to more than a mere "scintilla" of evidence in its
favor).  "However, reliance upon conclusory statements or mere allegations is not
sufficient to defeat a summary judgment motion."  Davis v. New York, 316 F.3d 93, 100
(2d Cir. 2002).

    B.    FOIA

Although "[s]ummary judgment is the preferred procedural vehicle for resolving
FOIA disputes," there are legal standards specific to the court's review of agency
decisions in the FOIA context.  Nat'l Immigration Project of Nat'l Lawyers Guild v. U.S.

Dep't of Homeland Sec., 868 F. Supp. 2d 284, 290 (S.D.N.Y. 2012) (citation and internal quotation marks omitted); see Unidad Latina en Accion v. U.S. Dep't of Justice, No. 3:09-CV-457 CFD, 2010 WL 7856573, at *2 (D. Conn. Oct. 20, 2010).  "FOIA was enacted in order to promote honest and open government and to assure the existence of an informed citizenry in order to hold the governors accountable to the governed. FOIA strongly favors a policy of disclosure and requires the government to disclose its records unless its documents fall within one of the specific, enumerated exemptions set forth in the Act."  Nat'l Council of La Raza v. Dep't of Justice, 411 F.3d 350, 355 (2d Cir. 2005) (citations, alterations, and internal quotation marks omitted); see also Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys., 601 F.3d 143, 147 (2d Cir. 2010) ("The basic purpose of FOIA reflected a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." (citation, alterations, and internal quotation marks omitted).

FOIA exempts from the government's disclosure obligations nine categories of information.  "Consistent with FOIA's purposes, these statutory exemptions are narrowly construed."  La Raza, 411 F.3d at 356; see also Bloomberg, 601 F.3d at 147 ("To implement this presumption for disclosure, FOIA exemptions have been consistently given a narrow compass." (citation and internal quotation marks omitted)).  "All doubts are resolved in favor of disclosure."  Bloomberg, 601 F.3d at 147 (citation, alterations, and internal quotation marks omitted).

Whether the movant or non-movant for Rule 56 purposes, the defendant agency in a FOIA action bears the burden of showing that it conducted an adequate search and that documents withheld fall within a specified FOIA exemption.  See Long v. Office of

9

Pers. Mgmt., 692 F.3d 185, 190 (2d Cir. 2012); Carney v. U.S. Dep't of Justice, 19 F.3d 807, 812 (2d Cir. 1994).  The strong presumption favoring disclosure and the burden on the government to justify non-disclosure apply equally to any redaction of information in the documents released by the agency.  See U.S. Dep't of State v. Ray, 502 U.S. 164, 174 (1991); Associated Press v. U.S. Dep't of Def., 554 F.3d 274, 283-84 (2d Cir. 2009). "The agency's decision that the information is exempt from disclosure receives no deference; accordingly, the district court decides de novo whether the agency has sustained its burden."  Bloomberg, 601 F.3d at 147.

Typically, FOIA cases proceed "primarily by affidavits in lieu of other documentary or testimonial evidence."  Long, 692 F.3d at 190.  "Affidavits submitted by an agency are 'accorded a presumption of good faith.'"  Carney, 19 F.3d at 812 (quoting SafeCard Servs., Inc. v. S.E.C., 926 F.2d 1197, 1200 (D.C. Cir. 1991)).  Hence, where the agency submits "affidavits or declarations supplying facts indicating that the agency has conducted a thorough search and giving reasonably detailed explanations why any withheld documents fall within an exemption," the agency's burden is met, and summary judgment is proper, even without any discovery in the case.  Id.  Indeed, "to justify discovery once the agency has satisfied its burden, the plaintiff must make a showing of bad faith on the part of the agency sufficient to impugn the agency's affidavits or declarations or provide some tangible evidence that an exemption claimed by the agency should not apply or summary judgment is otherwise inappropriate."  Id.

## IV.   DISCUSSION

In their respective Motion and Cross-Motions, the parties raise three issues:  (1) whether the untimeliness of DCMA's response to the FOIA Request constitutes a per se violation of DCMA's statutory obligations; (2) whether DCMA has conducted an

adequate search; and (3) whether, in cases of non-disclosure, DCMA has given reasons sufficient to justify application of one or more of the FOIA exemptions.

Based on the court's review of the pertinent law and the parties' submissions, including the ex parte submission of an unredacted copy of DCMA's disclosures to date, the court concludes as follows.  First, DCMA's repeated lengthy delays in handling this FOIA Request, while worrisome, do not entitle Carmody to summary judgment. Second, DCMA's search was adequate.  Third, while DCMA has sufficiently justified the bulk of its redactions, its proffered reasons are insufficient to justify redaction of:  (i) the middle section of the SF 1437, see Pl.'s Ex. C at 11; (ii) the tabular information on the Bridgeport II Connecticut Facility Move-Out Budgetary Cost Matrix, id. 71-78; and (iii) the data contained on the Recent Treasury Bill Auction Results, the attachment to the Boeing Sikorsky letter, id. at 70.  DCMA claims to have erroneously redacted the latter data and to have subsequently disclosed this document in its entirety to Carmody.  See Vaughn Index at 27.  Assuming that Carmody now has (iii) in its possession, Carmody is entitled to a further disclosure of (i) and (ii), consistent with this court's Ruling.

A.    Timeliness

DCMA concedes that "this particular FOIA request regrettably took much longer than it should have to process."  Defs.' Mem. in Opp'n to Pl.'s Mot. for Summ. J. and in Supp. of Defs.' Cross-Mot. for Summ. J. ("Defs.' Mem.") (Doc. No. 62) at 2.  Under the statute, an agency has twenty (20) working days from receipt of a request to determine whether to comply; thereafter, it is obligated to "immediately notify" the requester of its determination and "the reasons therefor, and of the right . . . to appeal to the head of the

agency any adverse determination." 5 U.S.C. § 552(a)(6)(A)(i).[3] In "unusual circumstances," including where the agency "need[s] to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the request," the statutory period for communicating the agency's determination may be extended up to ten (10) working days. Id. § 552(a)(6)(B).[4]

As evidenced by the1996 amendments to FOIA, which provide for expedited processing, see 5 U.S.C. § 552(a)(6)(E), Congress has shown "an increasing concern over the timeliness of disclosure, recognizing that delay in complying with FOIA requests may be tantamount to denial." Am. Civil Liberties Union v. Dep't of Def., 339 F. Supp. 2d 501, 504 (S.D.N.Y. 2004) (citation and internal quotation marks omitted). Contrary to Carmody's assertion, however, untimeliness is not a per se statutory violation entitling the requester to any specific remedy. See, e.g., Elec. Privacy Info. Ctr. v. Dep't of Justice, No. 13-CV-1961 (KBJ), 2014 WL 521544, at *5 (D.D.C. Feb. 11, 2014) ("[N]othing in the FOIA statute establishes that an agency's failure to comply with

---

[3] DOD regulations also set an expectation that DOD Components will comply with the 20-day statutory limit. See 32 C.F.R. § 286.4(d)(1) ("Generally, . . . DoD Components shall endeavor to provide a final response determination within the statutory 20 working days. If a significant number of requests, or the complexity of the requests prevent a final response determination within the statutory time period, DoD Components shall advise the requester of this fact, and explain how the request will be responded to within its multitrack processing system.").

[4] The D.C. Circuit has recently summarized FOIA's "comprehensive scheme" as follows:

An agency usually has 20 working days to make a "determination" with adequate specificity, such that any withholding can be appealed administratively. An agency can extend that 20-working-day timeline to 30 working days if unusual circumstances delay the agency's ability to search for, collect, examine, and consult about the responsive documents. Beyond those 30 working days, an agency may still need more time to respond to a particularly burdensome request. If so, the administrative exhaustion requirement will not apply. But in such exceptional circumstances, the agency may continue to process the request, and the court (if suit has been filed) will supervise the agency's ongoing progress, ensuring that the agency continues to exercise due diligence in processing the request.

Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n, 711 F.3d 180, 189 (D.C. Cir. 2013) ("CREW").

this 20-day deadline automatically results in the agency's having to produce the requested documents without continued processing.").  Where the agency fails to reply within the statutorily allotted 20 days or, in unusual circumstances, 30 days, the recourse under FOIA is litigation in federal court.  That is, the requester is "deemed to have exhausted his administrative remedies" and, hence, may sue immediately to compel disclosure.  5 U.S.C. § 552(a)(6)(C)(i); Citizens for Responsibility & Ethics in Washington v. Fed. Election Comm'n, 711 F.3d 180, 189 (D.C. Cir. 2013) ("CREW") ("Beyond those 30 working days, an agency may still need more time to respond to a particularly burdensome request.  If so, the administrative exhaustion requirement will not apply.").

The affidavits submitted by DCMA indicate that "unusual circumstances" apply here, because the agency had to search for materials from 2004 that were already archived or housed outside its central office.  See Williamson Decl. ¶ 13.  Nevertheless, DCMA's first email to Attorney Piantek fell outside even the extended 30-day statutory period permitted in such circumstances.  5 U.S.C. § 552(a)(6)(B).[5]  DCMA's time to supply a response sufficient to trigger FOIA's administrative exhaustion requirement lapsed in mid-July 2010, at the latest.[6]  Carmody was free to file the present FOIA action anytime thereafter.

---

[5] Even assuming timeliness, DCMA's July 22, 2010 email does not qualify as a "determination" within the meaning of FOIA. See CREW, 711 F.3d at 186 ("The statute requires that, within the relevant time period, an agency must determine whether to comply with a request—that is, whether a requester will receive all the documents the requester seeks. It is not enough that, within the relevant time period, the agency simply decide to later decide. Therefore, within the relevant time period, the agency must at least inform the requester of the scope of the documents that the agency will produce, as well as the scope of the documents that the agency plans to withhold under any FOIA exemptions.").

[6] By the court's calculation, 30 working days from receipt of the FOIA Request on May 28, 2010 would have been roughly July 13, 2010.

That Carmody waited until November 2011 to institute this action was its choice. While the long unexplained delays present here dismay this court, Carmody's statutory remedy is the instant suit.[7]  The decision not to file suit immediately following the lapse of any exhaustion requirement—perhaps in the hope of catching more flies with honey than vinegar—cannot transform repeated delays on the agency's part prior to filing suit into a basis to order discovery.  Rather, the court must determine:  (1) whether DCMA has conducted an adequate search; and (2) whether DCMA has adequately justified its redactions based on specified exemptions to FOIA's strong presumption favoring disclosure.

> B.    Adequacy of DCMA's Search

Where a plaintiff challenges the adequacy of an agency's search of its records, "the factual question . . . is whether the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant." Grand Cent. P'ship, Inc. v. Cuomo, 166 F.3d 473, 489 (2d Cir. 1999) (quoting SafeCard, 926 F.2d at 1201).  "An agency is not obliged to conduct a search of records outside its possession or control."  Jones-Edwards v. Appeal Bd. of Nat. Sec. Agency, 196 F. App'x 36, 38 (2d Cir. 2006).  The agency is thus responsible for devising a search reasonably calculated to locate requested materials that the agency itself created or obtained and over which it retains possession or control at the time of the FOIA request.  Grand Cent. P'ship, 166 F.3d at 489; see also Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 152 (1980) ("[P]ossession or control is a prerequisite to FOIA

---

[7] The court notes that, while there is no excuse for the delay in providing an initial determination long after the statutorily prescribed period, there were periods in which DCMA was awaiting responses from Carmody.  See, e.g., Defs.' L.R. 56(a)(1) ¶ 57.

disclosure duties . . . . [FOIA] does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained.").

The declarations of Ms. Williamson and Mr. Tursi establish that DCMA's search was adequate. DCMA conducted keyword and Contract-specific searches of the available electronic databases. See Williamson Decl. ¶¶ 9, 24. It examined records retrieved from a National Archives Center. Id. ¶¶ 13, 16. At Attorney Piantek's request, it also referred the FOIA Request to DCAA, which disclosed audits that were then examined by DCMA. Id. ¶¶ 17-20. Together, these methods were reasonably calculated to discover materials responsive to the FOIA Request.

The paucity of responsive materials disclosed to Carmody is not surprising under the circumstances, nor does it undermine the adequacy of DCMA's search. The U.S. Army terminated the Contract in 2004, and DCMA was not involved in the termination settlement negotiations. Id. ¶¶ 35.[8] Carmody's assertion that, given the settlement amount, DCMA must have in its possession more responsive documents pertaining to the Bridgeport II Facility is mere speculation and is insufficient to rebut the presumption of good faith to which agency affidavits are entitled. See Safecard, 926 F.2d at 1200 ("Agency affidavits . . . cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." (citation and internal quotation marks omitted)); Jones-Edwards, 196 F. App'x at 38 ("Mere speculation is not sufficient to withstand a motion for summary judgment.").

---

[8] In this regard, the court notes that the Price Memorandum released by DCMA to Carmody was not, in fact, in DCMA's possession at the time of the FOIA Request and was only produced to DCMA later by Mr. Metzger of the U.S. Army. Id. ¶¶ 6, 32.

Likewise, the fact that the materials received by Carmody refer to a broader background of documents not produced does not indicate that DCMA has withheld responsive documents and that the declarations of DCMA employees to the contrary are in bad faith.  It is true that a requester like Carmody will rarely, if ever, be in a position to prove the existence of other responsive records in the agency's possession. Mere reference, however, to documents not produced is insufficient to undermine the adequacy of DCMA's search, where, as here, that adequacy is supported by reasonably detailed, nonconclusory declarations by responsible agency personnel.  See Adamowicz v. I.R.S., 402 F. App'x 648, 651 (2d Cir. 2010).  While an agency must follow through on obvious leads, the agency cannot be expected to scour every document for clues as to additional locations of responsive documents.  See, e.g., Canning v. U.S. Dep't of Justice, 919 F. Supp. 451, 460 (D.D.C. 1994); Shurtleff v. United States Envtl. Prot. Agency, CV 10-2030, 2013 WL 5423963, at *6 (D.D.C. Sept. 30, 2013).

Indeed, Carmody does not argue that the references at issue point to specific responsive documents.  Rather, by Carmody's own account, these references indicate only a broader universe of documents relating to the Contract.  While it may be difficult to piece together what exists from what has been disclosed, Carmody declined other disclosures on the basis of cost.  See Defs.' L.R. 56(a)(1) ¶¶ 32 & 49.

In sum, the declarations of responsible DCMA employees establish that the agency's search was adequate.  Carmody points to no "obvious leads" in the present disclosures that would require DCMA to perform an additional reasonable good-faith

search for the missing items.  See Hall v. C.I.A., 881 F. Supp. 2d 38, 61-62 (D.D.C. 2012).

      C.    In Camera Review

In response to this court's Order on February 18, 2014, see Doc. No. 89, DCMA submitted an unredacted copy of its disclosures for in camera review.  FOIA provides for such review by the court "to determine whether [agency] records or any part thereof shall be withheld under any of the exemptions."  5 U.S.C. § 552(a)(4)(B).  While in camera review is the exception, not the rule, "the propriety of such review is a matter entrusted to the district court's discretion."  Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. N.L.R.B., 845 F.2d 1177, 1180 (2d Cir. 1988) (citations omitted).  Factors favoring in camera review include:  (1) judicial economy; (2) the conclusory nature of the agency affidavits; (3) bad faith on the part of the agency; (4) disputes concerning the contents of the documents; (5) whether the agency requests an in camera inspection; and (6) the strong public interest in disclosure. See Allen v. Cent. Intelligence Agency, 636 F.2d 1287, 1298-99 (D.C. Cir. 1980), overruled on other grounds by Founding Church of Scientology of Washington, D.C., Inc. v. Smith, 721 F.2d 828, 829 (D.C. Cir. 1983); Ferguson v. F.B.I., 752 F. Supp. 634, 636 (S.D.N.Y. 1990).  That the number of documents to be reviewed is relatively small may also weigh in favor of the court's conducting an in camera review.  See New York Times Co. v. U.S. Dep't of Justice, 872 F. Supp. 2d 309, 315 (S.D.N.Y. 2012).

In the instant case, DCMA did not request review in camera,[9] nor did the agency initially submit to the court ex parte an unredacted copy of its disclosures to accompany the Vaughn Index.  However, upon the court's preliminary review of the redacted records and Vaughn Index, the court determined that DCMA's submissions did not contain information "specific enough to obviate the need for an in camera review." Halpern v. F.B.I., 181 F.3d 279, 294 (2d Cir. 1999).  The number of documents at issue is relatively small, and the contents are heavily redacted and sharply disputed—in particular, as to the presence of confidential commercial information.

Thus, in connection with the pending Motion and Cross-Motions, the court ordered DCMA to submit ex parte an unredacted copy of the disclosures to date.  See Doc. No. 89.  Having reviewed this submission in camera, the court held oral argument on March 3, 2014, addressing some of its questions to DCMA and Sikorsky in an ex parte session.  The court is mindful, however, that its "inspection prerogative is not a substitute for the government's burden of proof."  Id. at 295.

D.    FOIA Exemptions

According to DCMA, no responsive records have been withheld in full.  See Williamson Decl. ¶ 36.  However, the materials released to Carmody contain extensive redactions, all of which DCMA has justified on the basis of one or both of two statutory exemptions:  (1) "trade secrets and commercial or financial information obtained from a person and privileged or confidential," 5 U.S.C. § 552(b)(4) ("Exemption 4"); and (2) "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," id. § 552(b)(6) ("Exemption 6").

---

[9] While not requesting review in camera, DCMA did propose such review in the alternative, were the court to find the agency's submissions insufficient.  See Defs.' Reply (Doc. No. 76) at 5 n.1.

1.      Exemption 4:  Confidential Commercial Information

As detailed in the Vaughn Index, DCMA has redacted virtually all cost-related and accounting information from its disclosures under Exemption 4.  Although Exemption 4 encompasses both trade secrets and other business information, neither Sikorsky nor DCMA claims that any redacted information qualifies as a trade secret. Thus, for Exemption 4 to apply, the information must be:  (1) "commercial or financial in character," (2) "obtained from a person," and (3) "privileged or confidential."  Nadler v. F.D.I.C., 92 F.3d 93, 95 (2d Cir. 1996) (citations and internal quotation marks omitted). Carmody does not dispute that the redacted information is commercial and was obtained from Sikorsky.  The sole issue is the confidentiality of this information.

In determining whether information is "privileged or confidential" for purposes of Exemption 4, courts in this Circuit ask whether release of the information is likely either: "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained."  Nat'l Parks & Conservation Ass'n v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974); see Cont'l Stock Transfer & Trust Co. v. S.E.C., 566 F.2d 373, 375 (2d Cir. 1977) (adopting the National Parks test).  DCMA does not argue that release of the redacted information would diminish the government's ability to obtain critical information.  Hence, the court considers only the second of the two prongs under National Parks—that is, whether release would likely cause substantial harm to Sikorsky's competitive position.

Under this second prong, "the court need not conduct a sophisticated economic analysis of the likely effects of disclosure."  Pub. Citizen Health Research Group v. Food & Drug Admin., 704 F.2d 1280, 1291 (D.C.Cir.1983).  Nor is it necessary for DCMA and

19

Sikorsky to "show actual competitive harm." Id. (quoting Gulf & W. Indus., Inc. v. U. S., 615 F.2d 527, 530 (D.C. Cir. 1979)).  Evidence revealing that Sikorsky (1) faces actual competition and (2) would likely suffer substantial competitive injury from release of this information "is sufficient to bring commercial information within the realm of confidentiality." Id.

DCMA has met this burden with respect to the bulk of redactions.   However, DCMA has not met its burden with respect to the redactions detailed in Section IV.D.1.c, infra.  Disclosure of the latter information is unlikely to harm Sikorsky and is, therefore, required by FOIA.

a.    Actual Competition

The court accepts DCMA's and Sikorsky's representations that Sikorsky and Boeing, the two private companies involved in the Contract, do not represent the entire aerospace industry.   See Defs.' Mem. at 16; Intervenor's Opp'n to Pl.'s Mot. for Summ. J. ("Intervenor's Mem.") (Doc. No. 80) at 6-7; Main Aff. ¶ 10.  DCMA and Sikorsky have identified several domestic and international competitors of Sikorsky in addition to Boeing, including Helibras, Lockheed, Northrup-Grumman, Russian Helicopters, DynCorp, BAE Systems, and L3 MAS.  See Defs.' Mem. at 16; Main Aff. ¶ 10.  By Sikorsky's own representation, the company currently faces actual competition in a bid for another U.S. government contract to build helicopters.  See Main Aff. ¶ 10. Carmody's contrary claim that Boeing and Sikorsky's partnership in the Comanche Project removes the need to keep the information at issue here confidential lacks any evidentiary support.  See Pl.'s Mem. at 18-19.

b.      Likelihood of Substantial Competitive Injury

The bulk of information withheld consists of General & Administrative ("G&A"), overhead, and profits as well as related cost information.  Sikorsky has credibly represented, and Carmody does not dispute, that what differentiates competitors in this industry is cost data and pricing structures, both of which are key to Sikorsky's bidding strategies.  See Invervenor's Mem. at 7; Main Aff. ¶¶ 8, 10.  While the information in the instant case is scarcely recent, it does not appear to be obsolete or valueless to Sikorsky's competitors.  See Main Aff. ¶ 9.  Disclosure of such information would likely give competitors advantages in future bids against Sikorsky.  See Main Aff. ¶¶ 8, 10.  And Sikorsky does not disclose such information to the public.  Id. ¶ 8.  Indeed, the information was marked as proprietary when disclosed to the government, and disclosure to third parties would normally be subject to Sikorsky's Non-Disclosure Agreement policy.  Id. ¶ 7.

Thus, with respect to the bulk of withheld information—which either directly reveals G&A, overhead, profits, and related costs—DCMA has adequately justified non-disclosure on the basis of Exemption 4.

c.      Required Disclosure of Non-Confidential Commercial Information

Although the majority of information withheld is warranted under Exemption 4, DCMA has not met its burden of showing a likelihood of substantial competitive injury with respect to certain redactions.  Having reviewed the unredacted documents in camera, the court concludes that disclosure of the information specified below is unlikely to harm Sikorksy in future bidding and is, therefore, required by FOIA.

21

   i.   <u>Middle Section of SF 1437</u>.  DCMA has redacted virtually the entire SF 1437.

<u>See</u> Pl.'s Ex. C at 11.  While both the tabular information at the top (rows 1 through 18,

columns a through d) and the names at the bottom may be withheld under Exemptions

4 and 6, respectively, <u>see</u> Section IV.D.2 <u>infra</u> (discussing non-disclosure of names), the

middle section entitled "Certificate" does not contain commercial data and is subject to

FOIA's presumption favoring disclosure.

   ii.   <u>Bridgeport II Connecticut Facility Move-Out Budgetary Cost Matrix</u>.  DCMA

has redacted everything but the headings of the tables contained on the Bridgeport II

Connecticut Facility Move-Out Budgetary Cost Matrix.  <u>See</u> Pl.'s Ex. C at 71-78.  While

labeling this denial "partial," Vaughn Index at 27, DCMA has denied Carmody any

information of value.  In an <u>ex parte</u> session at oral argument, counsel for Sikorsky

conceded that, along the spectrum of potential competitive injury, the information

withheld on this document falls at the low end.  This information consists principally of

descriptions of equipment removal, locations, and corresponding costs—all of which

relate to a single building, the Bridgeport II Facility.

   In his Affidavit, Mr. Main argues, in conclusory fashion, that disclosure of

renovation costs for a single facility would reveal "Sikorsky's manufacturing strategies."

Main Aff. ¶ 8.  The court accepts that G&A, overhead, and profits are essential

components of Sikorsky's bidding strategies.  The court cannot, however, credit the

large leaps in logic from the move-out costs for a single office building to manufacturing

strategies to overall bidding strategies.  In the court's view, the competitive injury from

disclosing such information, if any, does not rise to the level of "substantial" and,

therefore, does not justify redaction under Exemption 4.

iii.  Recent Treasury Bill Auction Results.  Third, DCMA has redacted all data contained on the Recent Treasury Bill Auction Results, the attachment to the Boeing Sikorsky letter.  See Pl.'s Ex. C at 70.  Yet, in its Vaughn Index, DCMA has also represented that this information was erroneously redacted and that an unredacted version has been provided to Carmody.  See Vaughn Index at 27.

Assuming that Carmody is already in possession of iii, the court notes the erroneous redaction under Exemption 4 and requires no further action by DCMA.  With respect to i and ii, the court concludes that Carmody is entitled to production of unredacted copies, because these redactions are unwarranted under Exemption 4.

2.     Exemption 6:  Private Personnel Information

DOD has directed that the names and contact information of federal employees be routinely redacted.  See Vaughn Index at 2.  Upon careful review of the applicable case law and the parties' submissions, including the unredacted documents, the court determines that DCMA has adequately justified the application of Exemption 6 to withhold the names and contact information of DOD and Sikorsky employees who were involved in termination settlement negotiations.

Exemption 6 covers "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6); see Defs.' Mem. at 31; Sikorsky Mem. in Supp. of Sikorsky's Cross-Mot. for Summ. J. (Doc. No. 79-1) at 9-10.  The purpose is to "protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information."  U.S. Dep't of State v. Washington Post Co., 456 U.S. 595, 599 (1982).

The files at issue here are not medical or personnel files.  The DOD defendants' claim to exempt these as "similar files" is, therefore, subject to the two-part balancing test described by the Second Circuit in Wood v. F.B.I., 432 F.3d 78 (2d Cir. 2005):

> First, we must determine whether the personal information is contained in a file similar to a medical or personnel file.  In considering whether the information is contained in a "similar" file, we ask whether the records at issue are likely to contain the type of personal information that would be in a medical or personnel file.  At the second step of the analysis under Exemption 6, we balance the public's need for the information against the individual's privacy interest to determine whether the disclosure of the names would constitute a "clearly unwarranted invasion of personal privacy."

Id. at 86.

The names and contact information sought by Carmody qualify as "similar files." This is true regardless of whether the individuals are employed by DOD or Sikorsky, because Exemption 6 covers the privacy interests not only of federal employees but also of employees of government contractors like Sikorsky.  See Hopkins v. U.S. Dep't of Hous. & Urban Dev., 929 F.2d 81, 87 (2d Cir. 1991).  Although names and business phone numbers do not, at first blush, resemble intimate information typical of medical and personnel files, the names of persons involved in defense contracts implicate privacy interests that both the Supreme Court and the Second Circuit have held to be "similar" for purposes of Exemption 6.  See, e.g., U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press, 489 U.S. 749, 763 (1989); Long v. Office of Pers. Mgmt., 692 F.3d 185, 191 (2d Cir. 2012).  Indeed, as the Second Circuit explained in Long, "the bar is low: 'FOIA requires only a measurable interest in privacy to trigger the application of the disclosure balancing tests.'"  692 F.3d at 192 (quoting Fed. Labor Relations Auth. v. U.S. Dep't of Veterans Affairs, 958 F.2d 503, 510 (2d Cir. 1992)).

Sikorsky and DOD employees' interest in not having their names disclosed in connection with the Comanche Project is clearly more than de minimis.  Under the low bar set by the Second Circuit, that interest is covered by Exemption 6 and qualifies as "similar" at the first of Wood's two steps.

In determining whether disclosure is nevertheless justified at the second step, the court balances this privacy interest against the public interest in disclosure.  See Fed. Labor Relations Auth. v. U.S. Dep't of Veterans Affairs, 958 F.2d 503, 510 (2d Cir. 1992).  Where the agency has demonstrated a privacy interest sufficient to implicate Exemption 6, the burden falls to the requesting party to establish that disclosure "would serve a public interest cognizable under FOIA."  Associated Press, 549 F.3d at 66.  In the court's balancing analysis, the focus is not the specific purpose for which the requester seeks the information but, rather, the purpose of FOIA itself—namely, to protect "the citizens' right to know 'what their government is up to.'"  Horowitz v. Peace Corps, 428 F.3d 271, 278 (D.C. Cir. 2005) (quoting Reporters Comm., 489 U.S. at 773).

The public interest in this case is negligible or nonexistent.  Carmody's own need for the information in connection with the State Court Action is immaterial to the public's interest in government accountability under FOIA.  Id. at 278-79.  "In many contexts, federal courts have observed that disclosure of individual employee names tells nothing about 'what the government is up to.'"  Long, 692 F.3d at 193 (citations omitted). Moreover, as counsel for DCMA represented at oral argument, the names and contact information sought in the present litigation are all of low-level Sikorsky or DOD employees.  Their identities, unlike those of department or agency heads, are of little or no public consequence here.  See Stern v. F.B.I., 737 F.2d 84, 92 (D.C. Cir. 1984).

Indeed, while there is a public interest in ferreting out potential fraud or waste in DOD

contracts, disclosure of the instant information does not directly advance that interest.

Even if this information could be of indirect use, the Second Circuit has cautioned courts

to focus their public interest analysis on the value of the information itself that is

revealed, not the speculative results to which use of that information might lead.  See

Long, 692 F.3d at 194 (citations omitted).

Given the measurable privacy interest and the absence of a cognizable public

interest, the court determines that DCMA has adequately justified its redaction of names

and contact information under Exemption 6.

### 3.    Release of Reasonably Segregable Portions

"Any reasonably segregable portion of a record shall be provided to any person

requesting such record after deletion of the portions which are exempt."  5 U.S.C. §

552(b).  DCMA is entitled to a presumption of compliance with its "obligation to disclose

reasonably segregable material."  Sussman v. U.S. Marshals Serv., 494 F.3d 1106,

1117 (D.C. Cir. 2007).  Because Carmody has not "specifically rebut[ted] this

presumption," DCMA bears no further burden in this regard.  Id.

As attested by responsible agency personnel, DCMA has reviewed all requested

records to determine which portions, if any, are reasonably segregable from exempt

information and has released all such reasonably segregable information to Carmody.

See Williamson Decl. ¶¶ 39-40.  Furthermore, having reviewed the unredacted

documents in camera, the court likewise finds that all reasonably segregable

information has been provided to Carmody with the exception of the items identified in

Section IV.D.I.c, supra, whose redaction the court has determined to be unwarranted.

The court's finding that all reasonably segregable information has been released to

Carmody in no way alters the court's conclusion above that Carmody is entitled to disclosure of these items.

**V.      CONCLUSION**

For the reasons set forth above, the court **GRANTS in part and DENIES in part** Carmody's Motion (Doc. No. 23) and **GRANTS in part and DENIES in part** the DOD defendants' and Sikorsky's Cross-Motions (Doc. Nos. 50 & 79).

The court **GRANTS** the DOD defendants' and Sikorksy's Cross-Motions for Summary Judgment as to the adequacy of DCMA's search, the redaction of most of the commercial information claimed under Exemption 4, and the redaction of all names and contact information under Exemption 6.  The court, however, **DENIES** these Cross-Motions with respect to the redacted commercial information specified in Section IV.D.1.c, supra.

Accordingly, the court **GRANTS** Carmody's Motion with respect to the latter redactions and otherwise **DENIES** its Motion.

DCMA is hereby **ORDERED** to disclose to Carmody within fourteen (14) days of this Ruling:  (1) the middle section of the SF 1437, see Pl.'s Ex. C at 11; and (2) all tabular information on the Bridgeport II Connecticut Facility Move-Out Budgetary Cost Matrix, id. at 71-78.

The Clerk is directed to close this case.

**SO ORDERED.**

Dated at New Haven, Connecticut this 13th day of March, 2014.


                                                    /s/ Janet C. Hall_____
                                                    Janet C. Hall
                                                    United States District Judge